**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

IN RE:                                          :        Chapter 7
                                                :
**DANIEL AND GEORGINA RICCA,**    :
                                                :        Bky. No. 18-17880 PMM
            **Debtors.**                        :
_____  :


# O P I N I O N


## I.  INTRODUCTION

Prior to filing for chapter 7 bankruptcy protection, Debtors Daniel and Georgina Ricca (the "Debtors")[1] financed various business ventures by borrowing money from D&P Private Lending, LLC ("D&P").  The Debtors defaulted on these loans, which resulted in a consensual modification of the lending agreements between the Debtors and D&P.  A key component of the modification – and the heart of the controversy before the Court – is the Debtor Husband's pledge of a security interest in an inheritance from his father.  The parties signed a contract to this effect, but D&P took no further steps to perfect the asserted security interest in the inheritance.

The modified agreements between the parties were executed prior to filing of the Debtors' bankruptcy petition.  In addition, the Debtor Husband's father, Michael Ricca ("Michael") died before the filing, advancing the issue of who exactly is entitled to the proceeds from Michael's estate, i.e., the chapter 7 trustee (for distribution to unsecured creditors) or D&P (for satisfaction of its alleged security interest).  The Debtor Husband's portion of the inheritance was paid to the chapter 7 trustee (the "Trustee") post-petition.  The Trustee remains in possession

---

[1]        Daniel Ricca will be referred to singularly as the "Debtor Husband."

of the funds and asserts that he is entitled to administer them as part of the chapter 7 liquidation process. D&P, seeking to collect, disagrees.

D&P asserts both that it is a secured creditor, its debt having been automatically perfected by a promised interest in the inheritance and, additionally, that because its security interest was never property of the bankruptcy estate, the lender is entitled to immediate payment of the amount owed (prior to the administration of the bankruptcy estate). The Trustee counters that D&P is not a secured creditor because the agreements between the Debtors and D&P failed effectively to create a perfected security interest pursuant to New Jersey's version of the Uniform Commercial Code (the "UCC").[2]

D&P filed two claims (claims no. 3 and 4, collectively, the "Claims"), as well as a Motion to Require the Trustee to Dispose of Certain Funds (the "Motion").[3] The Trustee objected to both Claims (the "Objections") and filed a Response to the Motion.

Upon consideration of the unusual facts and seldomly used law, and for reasons discussed below, I hold that the modified agreements entered into by the Debtors and D&P created a valid perfected security interest in the expected inheritance. I further hold that while the Debtor Husband's interest in the inheritance is property of the estate (an asset to be administered by the Trustee), it is subject to the security interest of D&P. Accordingly, only the balance remaining after deducting the secured claims of D&P and the Debtor Husband's exemption may be

---

[2]     While the parties refer to the asserted security interest as being perfected, the main issue is whether there is a valid security interest that attached to the inheritance. The Trustee has not moved to avoid the security interest for want of perfection. Therefore, any discussion of perfection, infra, is only to put matters into the larger context and informs the discussion of creating a security interest in an assignment of a beneficial interest in a decedent's estate.

[3]     Because D&P asserts two (2) claims in this case, it filed two (2) substantially similar motions seeking disposition of funds, see doc. #'s 34 and 36. For ease of reference, the two (2) motions will be referred to collectively as "the Motion."

administered by the Trustee.  D&P should receive immediate payment on its Claims.  Therefore,

the Objections will be overruled and the Motion will be granted.

## II. PROCEDURAL HISTORY

*Events in the Bankruptcy*

This chapter 7 bankruptcy case was filed on November 30, 2018.  Michael H. Kaliner is

the acting chapter 7 Trustee.

D&P is listed as a secured creditor on Schedule D, holding two (2) debts: one in the

amount of $19,208.44 and one in the amount of $92,789.76.  On Amended Schedule A/B, the

Debtors lists the "Potential Inheritance" of $40,000.00 from his father as being "[s]ecured by

Promissory Note to D&P Private Lending, LLC."  Doc. # 14 at 7.  The Debtor Husband claimed

an exemption of $2,774.00 pursuant to 11 U.S.C. §522(d)(5).  Amended Schedule C, doc. # 26.

The Debtors received a discharge on April 4, 2019.  Doc. # 20.  On April 22, 2019, the

Trustee filed a Notice of change from no-asset to asset and requested a claims bar date.  Doc. #

22.

On March 3, 2020, D&P filed the "Motion to Require Trustee to Dispose of Certain

Funds."  Doc. #'s 34 and 36.

*Proofs of Claim*

D&P filed two proofs of claim in this bankruptcy and amended each claim twice.

Claim Number 3, originally filed on July 2, 2019, states a secured claim in the amount of

$92,789.76 (described below as the "First Modified Loan").[4]  Claim Number 4 was also filed on

---

[4]        The claims were filed by "215 N. Street," which is an alternate name for D&P.

July 2, 2019 as a secured claim in the amount of $19,208.40 (described below as the "Second

Modified Loan").

The Claims were amended on August 6, 2019 asserting unsecured claims and both

Claims were subsequently amended on September 17, 2019 to re-state the claims (in the same

amounts) as secured claims.[5]  The second amended, secured claims will be referred to,

respectively, as "Claim 3" and "Claim 4."

On March 19, 2020, the Trustee objected to Claim 3 and Claim 4.  Doc. # 41.

A hearing was held on the Motion and the Objections on September 29, 2020.  Following

the hearing, the parties filed legal briefs.  The matter is now ripe for disposition.

### III.  FACTS

The facts in this contested matter are essentially undisputed and are taken from the Joint

Pre-Hearing Statement and the Debtors' schedules and statements. [6]

At the time of the bankruptcy filing, the Debtor Husband earned approximately

$71,000.00 as a computer technician for United Parcel Service.[7]  However, in calendar year 2016

prior to filing, the Debtor Husband and his spouse earned a total of $121,765.00 from a

combination of wages and the operation of a business.  See Statement of Financial Affairs (doc.

# 1 at 43).[8]  The Debtors also own Property Seller, LLC ("Property Seller"), a real estate holding

company.  See Schedule A/B at 5, Statement of Financial Affairs at 6.

---

[5]      The Proofs of Claim were amended and re-amended due to the underlying dispute between the parties
regarding whether D&P's interest in the inheritance was secured.  Doc. # 59 at 11.

[6]      The parties filed a Joint Pre-Hearing Statement.  Doc. # 59.

[7]      Mrs. Ricca was unemployed at the time of the filing.

[8]      Amended Schedule A/B shows interest in a company called "Ricca Incorporated."

Prior to the Petition Date, D&P and its affiliates,[9] financed two (2) commercial loans to the Debtors and Property Seller.

First, on or about August 2, 2016, the Debtors borrowed $872,000.00 (the "First Loan"), in order to improve property located at 30 Dorann Ave., Princeton, New Jersey ("the Princeton Property"). The First Loan was secured by a mortgage on the Princeton Property and a second mortgage on property located at 150 Mountaintop Road in Bridgewater, New Jersey ("the Bridgewater Property"). See Doc. # 59 at 8; Tr. Ex. 5A. On August 17, 2018, D&P and the Debtors modified the First Loan (the "Modified First Loan"). The Debtors owe $92,789.76 on the Modified First Loan, which is the balance on the loan following sale of the property. Id. D&P released its second mortgage on the Bridgewater Property as part of the Modified First Loan. See Tr. Ex. 5A at 2.

Second, on or about August 24, 2017, the Debtors and Property Sellers borrowed $570,000.00 from D&P in order to improve the Bridgewater Property (the "Second Loan"). The Second Loan was secured by a primary mortgage on the Bridgewater Property. Following the Debtors' default, the Second Loan was modified by agreement on August 17, 2018, the same day that the First Loan was modified (the "Modified Second Loan"). The Second Modified Loan clarified that the Debtors were only "personally responsible for . . . $19,208.44," which is the balance due following the sale of the property. Doc. # 59 at 7, 10. As part of the Modified Second Loan, D&P released its primary mortgage on the Bridgewater Property. See Tr. Ex. 7 at 2.

---

[9]    The affiliates of D&P include Peter Kallman, Lynn G. Ravitz, Equity Trust Company, Thomas G. Samakow and Michael K. Samakow Partnership, Idvo, LLC, Craig Rothenberg, Matthew Cooper, and Landings65, LLC. See doc. #'s 34 and 36 at Ex. B. For ease of reference D&P, together with these affiliates, will be referred to collectively as "D&P."

Both the Modified First Loan and the Modified Second Loan contain the following provision:

> **Borrower's Promise to Pay Principal and Interest**. Borrower promises to pay [principal amount] with interest… Borrower is responsible for only this debt and is not responsible [sic] the debt of any other member of Property Sellers, LLC. **The Debt is partially guaranteed by a Security Interest in inheritance in the estate of Michael L. Ricca**.

Tr. Ex. 5A at 2; Tr. Ex. 7 at 2 (emphasis added).  The First and Second Modified Loans (collectively, the "Modified Agreements") were executed on or about August 21, 2018, after the Debtor Husband informed D&P that he was entitled to an inheritance and was willing to secure the debts with this interest.  Doc. # 59 at 9.  D&P did not file a UCC financing statement or otherwise record its purported security interest in the Inheritance after execution of the Modified Agreements.  Doc. # 59 at 8.

Michael died testate on April 15, 2017 (after the First and Second Loans were executed but prior to the issuance of the Modified Agreements).  Michael's will split his assets evenly between his two (2) adult children, Todd Ricca and the Debtor Husband.  Tr. Ex. 13.  Michael's will was probated in New Jersey on May 23, 2017.  Id.

Following the completion of probate, on October 8, 2019, $146,272.41 of the Debtor Husband's inheritance (the "Inheritance") was paid directly to the Trustee.  See D&P Ex. 3; Tr. Ex. 1.  This amount reflects a net inheritance from Michael's estate of $149,046.41 minus the $2,774.00 paid to the Debtor Husband for his personal exemption.  Tr. Ex. 1 at 2.

## IV. THE PARTIES' ARGUMENTS

The Trustee maintains that the Claims are unsecured because the security interest that D&P asserts was created by the Modified Agreements is not "self-sustaining," i.e., the omission

of an "assignment agreement, a statement of assignment, or any other adequate *prima facie*

pleading evidencing the assignment of Mr. Ricca's beneficial interest as an heir, legatee, devisee

or otherwise" is fatal.  Objection, doc. # 41 at 7.  See also Trustee Brief at 18 (arguing D&P

needs "something more," namely an assignment "as opposed to a mere pledge").

D&P, conversely, insists that the Debtors effectively and conclusively conveyed a

security interest to it upon execution of the Modified Agreements.  D&P disputes the Trustee's

contention that "something more" is needed in order for the language employed to create a valid

and enforceable security interest in the Inheritance and its proceeds.  According to D&P, all

necessary elements were met.

The parties agree that New Jersey law applies[10] and that the New Jersey UCC governs

this dispute, N.J. Stat. §12A:1-101, et. seq.


## V.  STANDARD FOR DETERMINING AN OBJECTION TO A PROOF OF CLAIM

The standard for resolving a claim objection is well known and will be summarized

briefly.

Pursuant to 11 U.S.C §502(a), a proof of claim properly filed is deemed allowed unless a

party in interest objects.  If a party in interest objects, the court must determine the proper

amount of the allowable claim.  11 U.S.C. §502(b)(1).  A proof of claim filed in accordance with

the rules is *prima facie* "evidence of the validity and amount of the claim." Rule 3001(f).

The Third Circuit has summarized the shifting burden employed in determining a

contested proof of claim:

---

[10]    Further, there is consensus that Pennsylvania and New Jersey's interpretation of the UCC is substantially
the same.  Doc. # 63 at 4.  It is also worth noting that choice of law is generally not an issue with regard to UCC
causes of action because "for most purposes, the law under Article 9 is fairly uniform."  Barkley Clark, Revised
Article 9 of the UCC: Scope, Perfection, Priorities, and Default, 4 N.C. Banking Inst. 129, 136 (2000).

> [A] claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim ... [T]he objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) (internal citations omitted).

As aptly stated in another case in this district, "if a proof of claim complies with the Rules of Court and is self-sustaining (*i.e.,* it sets forth the facts necessary to state a claim and is not self-contradictory), it is prima facie valid and the objecting party has the burden of producing evidence to refute the claim."  In re Sacko, 394 B.R. 90, 98 (Bankr. E.D. Pa. 2008) (per J. Frank).  See also In re: Ditech Holding Corp., et al.,  2021 WL 219529, at *5 (Bankr. S.D.N.Y. Jan. 20, 2021).

Here, there is no dispute that D&P's two claims are at least *prima facie* valid.  The burden thus shifts to the Trustee to provide evidence sufficient to refute that validity.

## VI. ISSUE ONE: DOES D&P HAVE A VALID SECURITY INTEREST IN THE INHERITANCE?

### A.  The Debtor Husband's Right to Convey the Inheritance

Before discussing the nature of D&P's interest (i.e., whether its Claims are secured or unsecured) I must address the preliminary question of whether the Debtor Husband was able to transfer his interest in his pending inheritance from his father's estate when the Debtors entered into the Modified Agreements.  That is, after Michael died but before the proceeds of the estate were distributed, did the Debtor Husband have a conveyable interest in the prospective payout? The pleadings do not dispute that the answer to this question is yes.

Statutory and case law support this conclusion.

N.J.S.A. §3B:1-3 provides that an interest in property is transferred *at the time of a testator's death*:[11]

> Upon the death of an individual, his real and personal property devolves to the persons to whom it is devised by his will or to those indicated as substitutes for them in cases involving lapse, renunciation, or other circumstances affecting the devolution of testate estates, or in the absence of testamentary disposition, to his heirs, or to those indicated as substitutes for them in cases involving renunciation or other circumstances affecting devolution of intestate estates, subject to rights of creditors and to administration.

See also Egner v. Egner, 183 N.J. Super. 326, 328, 443 A.2d 1104, 1105 (Ch. Div.), aff'd, 185 N.J. Super. 1, 447 A.2d 182 (App. Div. 1982) ("It is settled law that title to real property vests in the heir or devisee automatically and immediately upon the death of the owner.") (emphasis added); In re Byrne, 541 B.R. 254, 257 (Bankr. D.N.J. 2015) (right to inheritance triggered upon testator's death).

Prior to distribution of estate assets, the beneficiary has a contingent or expectant interest in the property.  E.g. In re Kolb, 326 F.3d 1030, 1035 (9th Cir. 2003) (expected inheritance is contingency interest of bankruptcy estate); Montclair Nat. Bank & Tr. Co. v. Seton Hall Coll. of Med. & Dentistry, 96 N.J. Super. 428, 434–35, 233 A.2d 195, 198 (App. Div. 1967) (describing interest as "inchoate") (citing 6 N.J. Practice (Clapp, Wills and Administration) (3d ed. 1962), s 59.2, p. 384)).

Thus, upon becoming a beneficiary of an estate, an individual may assign or transfer the interest to which he is entitled - an expectant benefit.  As the Third Circuit summarized:

> A debtor may pledge as security property it does not fully own, but may only pledge the rights that it has in the property . . . It is hornbook law that the debtor can only grant a

---

[11]     The recipient's interest in the property is subject to both administration and the rights of creditors. Homestead at Mansfield Homeowners Ass'n v. Estate of Mount, 2014 WL 3055898, at *2 (N.J. Super. Ct. App. Div. July 8, 2014).

security interest in whatever rights he has in the collateral.
A debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach. .... [T]he baseline rule is that **a security interest attaches only to whatever rights a debtor may have**, broad or limited as those rights may be.

<u>In re WL Homes</u>, 534 F. App'x 165, 168 (3d Cir. Aug. 8, 2013) (emphasis added and internal citations and quotations omitted).

### B.  Did the Conveyance Create a Security Interest in the Inheritance Proceeds?

Thus, the Debtor Husband was able to and did, via the Modified Agreements, convey a secutiry interest in the money he was to receive from his father's estate.

The central question in this dispute is the nature of that interest - did the Modified Agreements succeed in creating a secured lien on the proceeds or, as the Trustee contends, does a defect in process for creating this interest mean that D&P is a mere unsecured creditor, in line with all the others?

For reasons discussed below, I find that the Modified Agreements succeeded in creating a valid security interest on behalf of D&P.

### i.    general procedure for creating a security interest in property

A security interest in property, as defined by the UCC, is "an interest in personal property which secures payment or performance of an obligation."

<u>In re B & M Hosp. LLC</u>, 584 B.R. 88, 91 (Bankr. E.D. Pa. 2018) (citations omitted). <u>See</u> <u>also</u> 68A Am. Jur. 2d Secured Transactions § 111("A security interest is an interest in some collateral that a lender can take if a debtor does not fulfill a payment obligation.").  Accordingly, a secured party is defined as a "person in whose favor a security interest is created or provided for under a

security agreement, whether or not any obligation to be secured is outstanding." N.J. Stat. Ann.

§ 12A:9-102 (72)(A) (West).[12]

In order to create a security interest in collateral in accordance with the UCC, the

following requirements must be met:

    (1) value must be given;

    (2) the debtor must have rights in the collateral or the power to transfer rights in the
            collateral to a secured party; and

    (3) there must be a security agreement and the satisfaction of an evidentiary requirement.

When all of the aforementioned requirements or elements exist, a security interest becomes

enforceable between the parties and attaches. 68A Am. Jur. 2d Secured Transactions § 111

(footnotes omitted). See also Matter of Bollinger Corp., 614 F.2d 924, 926 (3d Cir. 1980) (citing

Section 9-203, cmt. 1 and noting that a security agreement must be a writing signed by the debtor

which contains a description of the collateral); Granata v. Broderick, 446 N.J. Super. 449, 474,

143 A.3d 309, 324 (App. Div. 2016), aff'd, 231 N.J. 135, 172 A.3d 548 (2017).

The next step in allowing a creditor to take priority in collateral is usually the

"perfection" of an attached interest.

A security interest becomes "perfected," or given priority with regard to other creditor's

interests, when, in addition to the creation of a security interest, a financing statement is signed

by both parties and filed in the public record. The financing statement "serves the purpose of

giving public notice to other creditors that a security interest is claimed in the debtor's

collateral." Bollinger Corp., 614 F.2d at 926. The filing of a financing statement is ordinarily a

prerequisite to the perfection of a valid security interest. See N.J. Stat. Ann §12A:9-302.

---

[12]        "Security agreement" means an agreement that creates or provides for a security interest. N.J. Stat. Ann. §
12A:9-102 (73).

### ii.    exception to the general rule for inheritance proceeds

However, the UCC provides an exception to the process for perfecting a security interest. Under certain circumstances, including those present here, a security interest is *automatically* perfected upon attachment.

Section 12A:9-309 of the New Jersey UCC provides, in relevant part, that a "*security interest created by an assignment of a beneficial interest in a decedent's estate*" is "*perfected when [it] attach[es]*" (emphasis added).[13]  This provision explicitly provides that perfection is automatic if "the applicable requirements are satisfied before the security interest attaches." 9A N.J. Pl. & Pr. Forms § 78:96.

## C.  Analysis

### i.    nothing more was needed for the attachment of a valid security interest in the inheritance proceeds

The central question is thus whether the language of the Modified Agreements amounted to a valid attachment of a security interest or whether something additional was needed in order for D&P's rights to take hold.

The law supports D&P's position; the Modified Agreements were enough.

First, a specific form of or language provided in a security agreement is not mandated by the UCC.  According to the Sixth Circuit Bankruptcy Appellate Panel, a debtor can "easily" create an enforceable Article 9 security interest under Section 9-203 by effectively expressing an intent to do so:

> [] **no specific words or formalized documents are necessarily required to create a security interest** . . . It would be sufficient if the parties use language which leads to the conclusion that it was the intention of the parties that a security interest be created. . .

---

[13]     This portion of New Jersey's commercial law is "essentially uniform with the law in other states which have enacted revised Article 9 to the Uniform Commercial Code."  New Jersey Senate Committee Statement, S.B. 2690, 11/19/2001.

> it is enough for the debtor to write on the back of an envelope, 'I hereby grant bank a security interest in my cattle, John Jones.' If the bank makes a loan and the debtor owns the cattle, the parties created a valid security interest despite its informality. . . 9–203 does not require more . . . .

In re Giaimo, 440 B.R. 761, 768 (B.A.P. 6th Cir. 2010) (citing 4 White & Summers, *Uniform Commercial Code,* § 31–2) (emphasis added).  See also § 9-203:156 Financing statement, 8A Part II Anderson U.C.C. § 9-203:156 (3d. ed.) (". . . if there is a writing signed by the debtor which evidences an agreement that there be a security interest in that collateral, there is a sufficient written security agreement").

New Jersey common law, in turn, holds that a security interest attaches when the parties enter into a valid, signed agreement evidencing intent to transfer rights in collateral owned by the debtor.  See Matter of Marin Aviation, Inc., 53 B.R. 497, 501 (Bankr. D.N.J. 1984) (security interest attaches where there is evidence of a signed agreement transferring security interest in property owned by the Debtor) (applying New Jersey law); Granata v. Broderick, 446 N.J. Super. 449, 474, 143 A.3d 309, 324 (App. Div. 2016), aff'd, 231 N.J. 135, 172 A.3d 548 (2017); Shaw Mudge & Co. v. Sher-Mart Mfg. Co., 132 N.J. Super. 517, 520, 334 A.2d 357, 359 (App. Div. 1975) (security interest attaches upon agreement); First Cty. Nat. Bank & Tr. Co. v. Canna, 124 N.J. Super. 154, 157–58, 305 A.2d 442, 444 (App. Div. 1973) (noting that "an agreement creating a security interest in collateral . . . must contain language that grants or creates a security interest in the collateral. In short, the language in an agreement must be such as to clearly indicate that the debtor intended to thereby specifically grant to the creditor a security interest in the collateral"); M. Rutkin Elec. Supply Co. v. Burdette Elec., Inc., 98 N.J. Super. 378, 385, 237 A.2d 500, 504 (Ch. Div. 1967).

### ii.    a valid security interest in the Inheritance was created by the Modified Agreements

Application of the above standard to the facts of this case leads to the conclusion that the parties successfully created a perfected security interest on behalf of D&P.  As discussed, the New Jersey UCC provides that a security agreement is created upon satisfaction of the following three (3) elements: (1) value must be given; (2) the debtor must have rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) there must be a security agreement and the satisfaction of an evidentiary requirement.  N.J. Stat. Ann. § 12A:9-203.

The Trustee does not dispute that the Debtor Husband had rights in the collateral or that D&P gave value (in the form of a release of the second mortgage and not enforcing its rights due to the Debtors' default).  The Trustee's argument that a separate assignment was needed amounts to an assertion that the Debtors failed to authenticate a security agreement that provides a description of the collateral,[14] i.e., that the parties missed the third step of this process.

The relevant, and disputed, portion of the Modified Agreements provides that the "debt is partially guaranteed by a Security Interest in inheritance in the estate of Michael L. Ricca."  Doc. no. 34 at Ex. A at 2 (emphasis added).  The Modified Agreements were signed by the Debtors.

The issue, simple though hard fought, is whether this language is enough.  A description of collateral that is the subject of a security agreement is considered sufficient "whether or not it is specific, if it *reasonably identifies what is described*." U.C.C. § 9-10 (emphasis added). Courts have fleshed out the principle that common sense and circumstantial evidence should inform a decision regarding whether interest in collateral is made secure by particular language in an agreement. E.g. Bollinger Corp., 614 F.2d at 928 (holding that language in financing

---

[14]    If the Trustee, on the other hand, believes that a different standard for the creation of a security agreement applies, he has not said so.

agreement effectively created a security agreement and noting that "the better and more practical view is to look at the transaction as a whole in order to determine if there is a writing, or writings, signed by the debtor describing the collateral which demonstrates an intent to create a security interest in the collateral."); Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown, 318 F. Supp. 2d 230, 241 (M.D. Pa. 2004) ("neither federal nor Pennsylvania courts have reached consensus as to the permissible level of generalization [of language necessary to create a security interest];" Matter of Maple Contractors, Inc., 172 N.J. Super. 348, 356, 411 A.2d 1186, 1190 (Law. Div. 1979) ("The Uniform Commercial Code should be liberally construed and applied to promote its underlying purposes and policies").

Instructive on this point is In re Schwalb, 347 B.R. 726, 742 (Bankr. D. Nev. 2006).  In Schwalb, the chapter 13 debtor obtained a loan by pledging interest in two (2) of her cars by way of signing a pawn ticket.  The Court held that the pawn ticket effectively created a security interest on behalf of the lenders, despite the non-traditional format and language.  The court found:

> While a description may not be the act it describes, by signing the pawn ticket Ms. Schwalb acknowledged and adopted the act it described—giving a security interest . . . The insistence on formal words of grant or transfer is inconsistent with the structure and intent of Article 9 . . . Courts have often repeated that **no magic words are necessary to create a security interest and that the agreement itself need not even contain the term 'security interest.'** This is in keeping with the policy of the code that **form should not prevail over substance and that, whenever possible, effect should be given to the parties' intent** . . . There is no requirement for words of grant. In fact, such a requirement smacks of the antiquated formalism the drafters were trying to avoid.

Schwalb, 347 B.R. at 742–43 (emphasis added) (internal quotations and citations omitted).

The issue in our case is whether the provision in the Modified Agreements, guaranteeing the debt by a "security interest in inheritance in the estate of Michael L. Ricca," is a description

sufficient to satisfy prong three of the New Jersey test for the creation of a security interest. Does this language adequately describe the collateral being pledged?

I find that it does, for at least two (2) reasons:

First, it is difficult to imagine words or a description that more readily identify the collateral at issue—the money that the Debtor Husband was to inherit from his deceased father – just as it is a challenge to think that the passage at issue refers to anything *other* than this expected inheritance. An ordinary reading of the Modified Agreements easily and clearly tells the reader what the drafters meant.

Second, the parties agree that the Debtors' intent was to pledge the Inheritance to D&P in order to gain some breathing space with regard to his troubled debts. See Doc. # 59 at 11. As D&P points out, "it was [the Debtor Husband] who informed D&P of his inheritance in his father's estate . . . and his desire to use it to secure his obligations under the Agreements." D&P Brief at 10.[15] D&P extended forbearance to the Debtors in exchange for receiving a security interest in the Debtor Husband's share of Michael's estate. There are no grounds, either procedural or substantive, that warrant subversion of this mutual and codified goal.

### iii.    the Trustee's law does not contradict this conclusion

The Trustee offers no viable alternative analysis. Rather, the Trustee merely provides the following circuitous argument regarding why a security interest was not created by the facts presented here: "Because there was no assignment provided here concerning a beneficial interest in a decedent's estate, D&P's instant security interest contentions must fail . . . where there is no assignment of an interest . . . the security interest allegedly provided was defective for want of a

---

[15]    It was certainly the Debtor Husband's understanding that any inheritance he might receive from his father was security for the promissory note to D&P. This is how the asset is listed on Schedule A/B. Doc. # 1 at 16.

valid assignment." Tr. Brief at 16.  The argument thus boils down to the following: there is no assignment of the Debtors' rights in the inheritance where there is no assignment.

However, the Trustee fails to answer *the* critical question of *how* an assignment of a beneficial interest in an inheritance is created.  Such an understanding is necessary in order to determine whether an interest was transferred to D&P from the Debtor (and attached upon transfer).  The only portion of the Trustee's Brief addressing this issue merely sets forth that an assignment must comport with that "contemplated by N.J.S.A. §12A:9-309 (13)."  Tr. Brief at 18.  That section, as discussed above, allows that "a security interest created by an assignment of a beneficial interest in a decedent's estate is . . . perfected when [it] attach[es]" and does not describe how the security interest is created.  Thus the Trustee does not place his argument within the correct statutory framework.

Nor do the cases cited help.

For example, the main case relied on by the Trustee, <u>St. Charles Sav. & Loan Ass'n v. Estate of Sundberg</u>, 150 Ill. App. 3d 100, 110, 501 N.E.2d 322, 329 (1986), does not define what an "assignment" is, nor does it detail a process by which such transfer is a necessary part of perfection of a security interest.  Rather, this 35 year-old case discusses the failure of the SBA (the government) to perfect its alleged security interest in a land trust.  The case holds that there had been no assignment of a beneficial interest in such a trust until after a foreclosure decree.  That opinion does not set forth the procedure to perfect a security interest in inheritance proceeds pursuant to the New Jersey version of the UCC.

<u>In re Cutty's-Gurnee, Inc.</u>, 133 B.R. 934, 943 (Bankr. N.D. Ill. 1991) comes a little closer to discussing relevant law, holding that a future security interest may give rise to an equitable lien where the creating language does not reserve discretion to the debtor.  In other words, under

Illinois law, the assignment of a beneficial interest in a land trust does not have to be filed in order to be perfected. The case does not, however, set forth the steps necessary for creating a perfected interest. Thus, <u>Cutty's-Gurnee</u> does not stand for the proposition that the Trustee advances, <u>i.e.</u>, that proper assignment of a security interest requires "something more" in addition to a contractual agreement. Tr. Brief at 14. <u>See also</u> <u>In Lena v. Yannelli</u>, 78 N.J.Super. 257, 260, 188 A.2d 310 (1963) (Brief at 17) (upholding an assignment of a son's expectancy interest in mother's estate but lacking any discussion of creation of assignment as separate or additional necessary step).

The Trustee's insistence that "D&P's alleged security interest of a beneficial interest in a decedent's estate is defective for want of a valid assignment" (Brief at 18) remains unsupported by law.

## VII.  ISSUE TWO: WHEN IS D&P ENTITLED TO PAYMENT?

### A.  Section 725 of the Code

My conclusion that D&P's right to the Inheritance is a valid security interest resolves the Claim Objections. This determination, however, does not settle the issue of timing posed by D&P's Motion. The Motion seeks prompt payment of the secured amounts owed to D&P, without delay of the chapter 7 liquidation process. The creditor argues that its secured status means that the "portion of the Funds subject to the Lender's security interest is not property of the Debtor's bankruptcy estate and should be disbursed to the Lender." Motion at 3.

The Motion seeks this relief pursuant to 11 U.S.C. §725.  That section of the Code directs

payment to secured creditors prior to general distribution to unsecured creditors[16] and provides,

in relevant part:

> Before final distribution of property of the estate . . .  the trustee . . . <u>shall</u> dispose of any
> property in which an entity other than the estate has an interest, such as a lien, and that
> has not been disposed of under another section of this title.

11 U.S.C. §725 (emphasis added).  According to a leading treatise:

> Section 725 is in lieu of a provision that would direct a certain distribution to secured
> creditors, but it permits greater flexibility and is broader, since it permits disposition of
> property subject to a co-ownership interest. . .

> There may be occasions when a piece of property has more than inconsequential value
> and is, therefore, not subject to abandonment but cannot be liquidated. Section 725
> **permits collateral or its proceeds to be returned to the proper secured creditor,** and
> consigned or bailed goods to be returned to the consignor or bailor. . .

6 Collier on Bankruptcy P 725.01 (16th 2020) (emphasis added).  Section 725 does not get a lot

of traction and has been described as "too frequently overlooked."  <u>In re Engman</u>, 395 B.R. 610,

616 (Bankr. W.D. Mich. 2008).

Case law and legislative history does inform that §725 allows a trustee to dispense

property in which a creditor has a security interest, and which is not disposed of by other means,

such as abandonment, sale, or granting stay relief so that a creditor may proceed with state court

foreclosure.  <u>See</u> <u>Engman</u>, 395 B.R. at 619 (holding that §725 governs the trustee's authorization

to distribute amounts owed to lienholders and noting that the provision governs instances where

the lien in question has not been disposed of); <u>In re 82 Milbar Blvd. Inc.</u>, 91 B.R. 213, 220

---

[16]    Distribution by a trustee of property of the estate to unsecured creditors is controlled by 11 U.S.C. §726.
Under the chapter 7 distribution scheme, the trustee is required to address secured claims *prior* to making
distribution on account of priority and general unsecured claims.  <u>In re Glaser</u>, 2002 WL 32375007, at *13 (Bankr.
E.D. Va. Oct. 25, 2002); <u>In re DigitalBridge Holdings, Inc.</u>, 2015 WL 5766761, at *18 (Bankr. D. Utah Sept. 30,
2015) (noting that section 726 makes no provision for a secured creditor).

(Bankr. E.D.N.Y. 1988) (disposition of property) (discussing legislative history); In re Talbert, 268 B.R. 811, 818 (Bankr. W.D. Mich. 2001), subsequently aff'd, 344 F.3d 555 (6th Cir. 2003) (noting that section 725 is "rarely utilized"); DigitalBridge Holdings, 2015 WL 5766761, at *18 (section 725 calls for distribution of property subject to a lien prior to property of the estate in which there is no lien).

Although §725 is a provision which both directs a trustee in his actions and permits the trustee greater flexibility, a creditor (as opposed to the trustee himself) may – as here – bring a motion seeking distribution pursuant to this section.  See In re San Jose Airport Hotel, LLC, 2015 WL 7009292, at *2 (B.A.P. 9th Cir. Nov. 3, 2015) (creditor brought motion for relief pursuant to §725); In re Mahaner, 34 B.R. 308, 310 (Bankr. W.D.N.Y. 1983) ("11 U.S.C. § 725 establishes a right in the secured creditor . . . for the return to the creditor of any property that the trustee has not otherwise administered."); In re Hess, 40 B.R. 491, 491 (Bankr. W.D. Va. 1984) (same).

## B. Analysis

The principal purpose of §725 is "to give the trustee flexibility in disposition of assets that are not of benefit to the estate or the debtor."  6 Collier on Bankruptcy P 725.01.  In determining whether this section is applicable to the facts presented - and whether the court should use its discretion to order the relief D&P seeks - I must take a step back and consider the question, raised in the Motion, of whether D&P's interest is property of the estate which the trustee has an interest in administering.

### i.    the Inheritance proceeds became property of the estate upon distribution

It is important to recognize that Debtor Husband's contingent interest in the Inheritance became property of the estate at the time of the bankruptcy filing.  See 11 U.S.C. §541(a)(1) (property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."); Matter of Chenoweth, 3 F.3d 1111, 1113 (7th Cir. 1993) ("the property, in the eyes of the law, vested in her at the time of the testator's death"); In re Brown, 2018 WL 2308267, at *4 (B.A.P. 9th Cir. May 21, 2018), affd  953 F. 3d 617 (9th Cir. 2020) ("At the time that Jason commenced his bankruptcy case, his father had passed away, the probate case had commenced, and his brothers had assigned their beneficial interests to him. His legal interest in his father's estate therefore existed at the time of his bankruptcy and was an asset of the estate.").

A timeline of the critical events demonstrates why the Debtor Husband maintained this interest in the proceeds:

- Michael Ricca died, testate, on April 15, 2017;

- The Modified Agreements were executed by D&P and the Debtors on August 21, 2018;

- The Debtors filed for chapter 7 bankruptcy protection on November 30, 2018;

- The Inheritance was paid to the chapter 7 Trustee by the Executor of Michael's estate on October 8, 2019;

- D&P filed the Motion to Require the Trustee to Dispose of Certain Funds on March 3, 2020.

The Debtor Husband's contingent interest ripened into a present possessory interest of the bankruptcy estate when probate was completed and the funds were disbursed by the Executor of Michael Ricca's estate.[17]

### ii.    the portion of Inheritance proceeds subject to D&P's security interest is *not* property of the estate

As a general rule, then, an inheritance paid to a debtor becomes property of the estate— assets to be administered and distributed by the chapter 7 trustee.

But this case is not so simple.  The Debtor Husband's interest in the Inheritance was subject to the secured lien of D&P.  Thus, while the portion of the Inheritance in which the Debtor Husband maintained an interest is property of the bankruptcy estate, the portion upon which D&P holds a security interest is **not** property of the estate.

The objective of chapter 7 bankruptcy is liquidation of available assets of the debtor and that the trustee's "principal duty is to administer estate property so as to maximize **distribution to unsecured creditors**, whether priority or general unsecured."  In re Bird, 577 B.R. 365, 375 (B.A.P. 10th Cir. 2017) (internal quotation and citation omitted; emphasis added).  See also In re Rambo, 297 B.R. 418, 433 (Bankr. E.D. Pa. 2003).

In other words, the trustee works only to provide a payout to unsecured creditors; secured creditors in a chapter 7 are protected by their liens:

> A Chapter 7 trustee does not make distributions to lien holders on account of an allowed secured claim which that lien holder may have against the estate. Section 726 is quite clear that distributions by the Chapter 7 trustee are generally to be limited to only

---

[17]    The fact that probate of the estate was completed and the Inheritance was distributed by the Executor of Michael's estate also means that this court has jurisdiction over this matter.  If the funds remained in the possession of the probate court, this court would be divested of jurisdiction due to the "probate exception," which is a "judicially created doctrine that limits federal jurisdiction. . . The probate exception is the principle that "a federal court has no jurisdiction to probate a will or administer an estate."  In re Garcia, 507 B.R. 32, 44 (B.A.P. 1st Cir. 2014) (citing Marshall v. Marshall, 547 U.S. 293, 308 (2006)) (additional citation omitted).  See also Three Keys Ltd. v. SR Util. Holding Co, 540 F.3d 220, 226 (3d Cir. 2008); Sklar v. Grassi, 2020 WL 3088798, at *1 (Bankr. D. N.J. June 10, 2020) (probation is the exclusive domain of a probate court.)

<u>creditors having an allowed priority or non-priority unsecured claims</u> against the estate.

<u>Talbert</u>, 268 B.R. at 815 (emphasis added).  <u>See</u> <u>also</u> <u>In re KVN Corp., Inc.</u>, 514 B.R. 1, 5

(B.A.P. 9th Cir. 2014) ("the Code never contemplated that a Chapter 7 trustee should act as

a liquidating agent for secured creditors who should liquidate their own collateral").

The Code thus contemplates a system whereby secured creditors are paid not through the

liquidation process, but by collecting on their secured interests.  The further consequence is that

the interest of a secured creditor is not property of a chapter 7 bankruptcy estate, even if the

Debtor's interest in the same property remains property of the estate.  Again, the <u>Talbert</u> court

sets this out:

> "property of the estate" is not, by definition, the actual house or car but, instead, is **only
> the debtor's rights** with respect to the house or car . . . Competing with the debtor's
> bundle of rights are the interests of the lien holder. **The lien holder's interest would
> include the right to repossess the asset from the debtor and a superior right to the
> proceeds of the asset upon its disposition.** . . . Therefore, while it may be convenient to
> describe "property of the estate" as being all of the property at the outset of the case in
> which the debtor has some interest, this description is incorrect. The debtor may have
> outright title to many of these assets. However, it is also likely that other parties will have
> competing rights in at least some. . . .What Congress has empowered the Chapter 7
> trustee to do is to dispose of these assets in such a manner as to separate the property of
> the estate (*i.e.,* the debtor's interest in these assets) from the competing interests in these
> same assets so that the Chapter 7 trustee may then distribute the property of the estate
> pursuant to Section 726.

268 B.R. at 816.  <u>See</u> <u>also</u> <u>Engman</u>, 395 B.R. at 617–18.

### iii.    D&P is entitled to receive its distribution now

The framework set forth above leads to the conclusion that D&P's Motion has merit.

Section 725 permits and indeed calls for the satisfaction of secured creditors without the delay of

administration of the estate for the benefit of unsecured creditors.  <u>See</u> <u>In re Scimeca Found.,</u>

<u>Inc.</u>, 497 B.R. 753, 782 (Bankr. E.D. Pa. 2013) ("With fully encumbered property, the proceeds

must be paid to the secured creditors . . . Section 725 permits collateral or its proceeds to be

returned to the proper secured creditor....") (internal quotation marks omitted).

Further, the unusual facts of this case – that D&P has a secured interest in money, rather

than in real property or an otherwise illiquid asset - make a distribution on account of the secured

debt both possible and straightforward.  While it is true that D&P has a security interest in only a

portion of the Inheritance proceeds,[18] this fact is of no moment because dividing a sum of money

requires no analysis of liquidation costs, finding of interested buyers, or calculation of

transaction costs and fees.  It requires only the Trustee to write a check.

The Trustee does not assert otherwise and, in fact, makes no argument that delayed

payment to a secured creditor benefits the bankruptcy estate or its creditors.

Therefore, the Motion will be granted.


# VIII. CONCLUSION

D&P obtained a security interest in the funds the Debtor Husband anticipated from his

father's estate when the parties consented to and entered into the Modified Agreements. Contrary

to the contention of the Trustee, nothing more was needed beyond the Agreements in order to

effectuate this transaction.

The secured status of D&P on the one hand means that the Debtor's Objections to the two

(2) secured claims filed by D&P must be overruled and on the other hand that the creditor's

---

[18]     The total amount of the Debtor Husbands's Inheritance is $149,046.41.  After providing the Debtor
Husbandwith his $2,744.00 claimed exemption, the Executor paid the Trustee $146,272.41.  D&P's Claims amount
to a total of $111,998.16 (Claim 3 for $92,789.76 and Claim 4 for $19,208.40).  Therefore, the portion of the
Inheritance remaining after the immediate payment to D&P on its claims will be $37,048.25.  Presumably, this
amount will be distributed to unsecured creditors.

secured claims have no place in this chapter 7 bankruptcy case.  D&P is entitled to payment of

its secured interest now, prior to the administration of the estate and the payment of claims by the

Trustee.

      For these reasons, the Objections will be overruled and the Motion for disposition of the

funds will be granted.  An appropriate order follows.


Date: **February 26, 2021**

          **PATRICIA M. MAYER**
          **U.S. BANKRUPTCY JUDGE**